**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Eric Antonio PARKER, Defendant–Appellant.**

No. 92–5200.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 16, 1992.

Decided July 6, 1993.

Daniel A. Clancy, U.S. Atty., John Fowlkes, Asst. U.S. Atty., argued and briefed, Memphis, TN, for plaintiff-appellee.

William D. Massey, briefed, Memphis, TN, John E. Herbison, argued, Nashville, TN, for defendant-appellant.

Before: MARTIN and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.

## ORDER

The opinion decided and filed on May 18, 1993 is hereby ORDERED withdrawn.

BOYCE F. MARTIN, JR., Circuit Judge.

Eric Antonio Parker appeals his jury convictions for conspiracy to possess and to distribute cocaine, in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Parker was sentenced to life imprisonment for his role in a major cocaine distribution ring in Memphis, Tennessee. For the following reasons, we reverse both convictions and remand the case for a new trial.

In 1990, law enforcement officers conducted surveillance activity in Tennessee and Florida to investigate drug trafficking by several individuals in Memphis. On October 9, police observed Steve Ross carrying a silver plastic bag into the Oxford Shop in Memphis from a red Cadillac in which Parker was a passenger. Elbert Payne later carried three silver bags out of the store. Payne got into a black Mustang operated by an undercover law enforcement officer. The undercover officer determined that one of Payne's bags contained two kilograms of cocaine after observing Payne open a shoebox within one of the bags and inhale some of the powder. Payne then commented that the cocaine was strong. Payne subsequently distributed the contents of the bag to individuals at a residence on White Rock Street and at a Shoney's restaurant in Memphis.

Several hours later, Brian Chambers, an agent of the Drug Enforcement Agency, arrested Parker inside the Oxford Shop based upon an outstanding warrant from Tallahassee, Florida. After Parker's arrest, Brian Chambers asked Parker for his cooperation in investigating cocaine distribution in Memphis while Parker and Chambers were riding from the Oxford Shop to the office of the Drug Enforcement Agency. Parker admits that he received the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before making any inculpatory comments, but Parker alleges that Chambers also told him that his statements would not be used against him and that he would be sent to Florida to face charges there. Parker believed that another individual, Tavin Chandler, was the target of the investigation.

Parker agreed to cooperate and provided basic information about methods of transporting cocaine and the identity of significant customers. Parker told Chambers that he bought cocaine in Miami or Houston for $24,000 to $25,000 per kilogram and that he sold it to Tavin Chandler or Elbert Payne for $29,000 to $30,000 per kilogram. Parker indicated that the distribution activities began in January or February of 1990 and continued until his arrest. In addition, he stated that Marvin McGuire, James White, Harold Beame, and Steve Ross were involved in the distribution effort, which involved shipments of ten to fifteen kilograms approximately two times per month.

After discussing the distribution scheme, Parker agreed to telephone his associates and arrange additional transactions to implicate the others. With Parker's consent, law enforcement officers recorded phone conversations between Parker, Ross, Payne, and Tavin Chandler. Parker was unable to arrange any new transactions.

On December 10, a federal grand jury returned an eleven-count indictment against Parker and several others. On March 20, 1991, the same grand jury returned a thirteen-count superseding indictment. Count one charged Parker and six other men with conspiracy to possess and distribute cocaine from January 1, 1990 through October 31, 1990. The third count charged Parker, Elbert Payne, and Steve Ross with possession with intent to distribute approximately two kilograms of cocaine on October 9, 1990, the

day of Parker's arrest. Parker was not charged in any other counts of the indictment.

The district court granted a motion by Parker to sever his case from the trial of his co-defendants. The court also granted Parker's motion to suppress evidence regarding items found in a residence where Parker lived. The court, however, denied Parker's motion to suppress evidence of Parker's statements made upon his arrest and subsequent conversations that were tape-recorded by the United States with Parker's consent.

On April 19, 1991, a jury found Parker guilty on both the conspiracy charge and possession with intent to distribute cocaine. On December 6, the district court imposed a sentence of life imprisonment without parole pursuant to 21 U.S.C. § 841(b)(1)(A). Parker filed a timely notice of appeal.

There were four errors below that cumulatively necessitate reversal of the convictions. Taken in isolation, these errors may be considered harmless. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (holding that an error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") After examining them together, however, we are left with the distinct impression that the due process was not satisfied in this case. *See Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.), *cert. denied*, 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983) (holding that errors that may be deemed harmless if standing alone may cumulatively amount to a denial of due process).

First, Chambers disclosed at trial that charges for "conspiracy to distribute" were pending against Parker in Tallahassee, Florida. Parker moved for a mistrial based on this disclosure, but the district court denied the motion. We review a district court's denial of a motion for mistrial under an abuse of discretion standard. *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir.1990), *cert. denied sub nom. Black v. United States*, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991). The introduction of this evidence was error. In *United States v. Terry*,

729 F.2d 1063, 1070 (6th Cir.1984), we noted that "[o]ne sure way to destroy [the] presumption [of innocence] is for a seasoned officer to interject an 'inadvertent' remark about a defendant's criminal history." This court's role on review is to determine whether the errors "so adversely affected the rights of the defendant as to compel reversal." 729 F.2d at 1070. The district court instructed the jurors to disregard the "part of the answer which was conspiracy to distribute." This curative measure was insufficient to overcome the prejudicial impact of Chamber's remark.

Second, the United States introduced into evidence a photograph of an unidentified baby playing with large sums of money. The photograph was seized from Tavin Chandler's residence two months after Parker's arrest. The United States argued that the picture was relevant to show that the transactions were for significant amounts of money. The relevance of this evidence is highly questionable, and the picture certainly should have been excluded in accordance with FED. R.EVID. 403. The risk of unfair prejudice outweighs the potential probative value of the photograph.

Third, Parker was charged and convicted for continuing to participate in a conspiracy until October 31, twenty-two days after his arrest. The United States might have intended to prosecute Parker for involvement in the conspiracy only until October 9, the date of his arrest. However, the indictment charged Parker with and the jury convicted him for involvement in a conspiracy which continued while he was in government custody. This was error. After his arrest, Parker became a United States' informant and should not have been prosecuted for continuing participation in the conspiracy. This error is harmless in isolation, but in conjunction with the following error, it has a prejudicial effect that mandates a new trial.

Fourth, the United States used tape-recorded conversations made while Parker was cooperating with government agents as evidence that he violated the law. After his arrest, Parker telephoned his associates solely at the request of the Drug Enforcement Agency agents and these conversations were

recorded by the agents. The agents requested Parker's assistance to implicate his co-conspirators. We find the United States' use of the tape-recorded conversations against an incarcerated defendant after requesting his assistance in making the phone calls to coordinate drug deals so as to implicate co-defendants is so outrageous as to violate due process. *United States v. Robinson,* 763 F.2d 778, 785 (1985). After asking for and receiving Parker's assistance, the United States then introduced these tape recordings to establish that Parker was participating in an ongoing illegal drug conspiracy. The agents clearly directed the plan, which incriminated Parker. On several occasions, an agent even dialed the telephone number for Parker and handed him the phone to set up drug transactions.

The recordings were some of the most damning evidence presented at trial. Use of the tapes to show that a conspiracy continued until October 9, 1990, the date when Parker was arrested and began cooperating, would have been harmless because of Parker's extensive confessions upon arrest. However, use of the tapes was not limited to establishing the existence of a conspiracy prior to Parker's arrest. The recorded phone calls were introduced before the jury without any limiting instruction; therefore, the jurors could have considered the recorded conversations as evidence that the conspiracy was in existence between October 9 and October 31, 1990. It would be improper for the jurors to consider the recorded conversations as evidence that a conspiracy was in existence after Parker's arrest because the government directed all of Parker's actions that seemed to continue the conspiracy after October 9. Consequently, we believe that admission of the tapes was an error.

The combined effect of these four errors was so prejudicial as to strike at the fundamental fairness of the trial. *See Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), *cert. denied,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983) (holding that errors that may be deemed harmless if standing alone may cumulatively amount to a denial of due process). The admission of the drug charges in Florida, admission of the photograph of the baby with money, the error in the dates of the conspiracy charged in the indictment, and the admission of the tapes made while he was a government informer cumulatively prejudiced Parker's right to a fair trial. Although each error might have been harmless in isolation, the prejudicial effect of the combination of foregoing errors warrants a new trial on both charges.

■ The question of the admissibility of Parker's confession and recorded statements made while Parker was a government informer should also be revisited on remand. Parker was facing a possible sentence of life imprisonment without parole when Chambers asked Parker to cooperate after arresting him. The fact that Parker did cooperate brings forth the question of what statements by Chambers induced Parker's cooperation. If Chambers granted Parker immunity from prosecution, then Parker's statements should not have been admitted. *See Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (holding that although *Miranda* requires the suppression of any unwarned admission, the admissibility of any subsequent inculpatory statements should turn on whether they were uncoerced and voluntary).

The record does not establish exactly what Chambers said to persuade Parker to cooperate. Chambers and Parker were the only people present for the entire discussion after the arrest. In the suppression hearing, Chambers testified that he promised Parker nothing, but Parker testified that Chambers told him that "whatever happened here wasn't going to be used against [Parker]." (Suppression Hearing, p. 11). Parker stated that he would not have made the confessions if he had known that he would face new charges as a result of his statements. Reginald Drake, a Memphis police officer who witnessed part of the conversation, stated that Chambers told Parker "maybe we could explain to the U.S. Attorney to help him on his case ..." (Trial Record, p. 232). Even if there was no explicit grant of immunity, the comment to which Drake refers could have given Parker the false hope that he would not be prosecuted for any criminal activity in Tennessee if he assisted the police. Cham-

bers knew, or should have known, that life imprisonment was mandatory; therefore, leniency was not possible.

Parker's cooperation does not make sense on the record before us. The evidence sharply conflicts about whether Chambers made any promises to Parker to induce his cooperation. The questions of whether Parker received a grant of immunity or promise of leniency should be reexamined more fully. The district court is guided by 18 U.S.C. § 3501(a), which provides:

If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

If the trial court determines that the confession is admissible, section 3501 " 'unequivocally require[s] a specific charge on the issue of voluntariness.' " *United States v. McLernon*, 746 F.2d 1098, 1118 (6th Cir.1984) (quoting *United States v. Barry*, 518 F.2d 342 (2d Cir.1975)). The district court must provide a specific voluntariness instruction where there is a genuine question of fact regarding the voluntariness of the defendant's confession. 746 F.2d at 1118.

We need not determine the correctness of Parker's remaining arguments because we have already determined that he is entitled to a new trial. Accordingly, we hereby reverse both convictions and remand the case for a new trial.

BOGGS, Circuit Judge, concurring separately.

I agree with the court's opinion that "inadvertent" prejudicial remarks by a law enforcement officer revealing bad information about a defendant may warrant reversal. I write separately, however, to note that I believe the court's opinion makes far too much of two of the four items it mentions.

First, I address the fact that the government introduced as evidence tapes made by Parker while cooperating with the government after his arrest on October 9, while the indictment technically included conduct through October 31. At oral argument, despite the court's best efforts to elicit any information indicating that this evidence may have been used to Parker's disadvantage by serving as proof that he was continuing to participate in the conspiracy by his government-directed activities, both counsel stoutly expressed astonishment at such an idea, and a perusal of the record indicates that there was no argumentation or innuendo that would have encouraged the jury to make such an inference. It certainly would have been improper sandbagging for the government to induce Parker to undertake actions as a government agent and then use those actions to convict him, but there is no indication in the record that this is what occurred.

Second, the court seems particularly dubious about the admissibility of Parker's confession, noting that "Parker's cooperation does not make sense on the record before us," and emphasizes that 18 U.S.C. § 3501 requires an instruction on voluntariness where there is a genuine question of fact regarding the voluntariness of the defendant's confession. However, Parker did not request any such instruction, nor did he make an objection at trial to the voluntariness of the confession or to its introduction. Therefore, the trial court did not err, nor require admonition, on this point. The court's statement appears to echo Circuit Judge Edgerton in *Higgins v. United States*, 209 F.2d 819, 820 (D.C.Cir.1954), where he questioned whether there could ever be consent to a search that actually finds contraband. "But no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered."

Our legal system does not require us to assume that all persons who are accused, or even guilty, always take the course of action best designed to prevent the legal system from making an accurate assessment of their situation. I think it is completely illegitimate to assume that because a person cooperated and made a statement detrimental to his immediate penal interest, there must have been coercion or improper conduct leading up to the giving of that statement. I find

nothing peculiar in the record of this case that would lead to suspicion beyond what might attach to any recorded statement.