# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, K.J. BRUBAKER, M.C. HOLIFIELD**
**Appellate Military Judges**

## UNITED STATES OF AMERICA

v.

## PATRICK G. EDMOND
## MIDSHIPMAN THIRD CLASS (MIDN 3/C), U.S. NAVY

### NMCCA 201200168
### GENERAL COURT-MARTIAL

**Sentence Adjudged:** 29 September 2011.
**Military Judge:** Col Daniel Daugherty, USMC.
**Convening Authority:** Superintendent, United States Naval Academy, Annapolis, MD.
**Staff Judge Advocate's Recommendation:** CAPT Robert J. O'Neill, JAGC, USN.
**For Appellant:** LT Carrie Theis, JAGC, USN; LT David Warning, JAGC, USN.
**For Appellee:** LT James L. Belforti, JAGC, USN; Capt Matthew M. Harris, USMC.

### 30 April 2015

---
### OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

MITCHELL, Chief Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of making a false official statement, two specifications of rape, two specifications of aggravated sexual assault, and wrongful sexual contact in violation of Articles 107 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 920. He was sentenced to

6 months' confinement and a dismissal from the United States Naval Service.  The convening authority (CA) approved the adjudged sentence and, with the exception of the dismissal, ordered the sentence executed.

The appellant asserts the following assignments of error: (1) that the trial defense counsel committed numerous errors during trial which denied him effective assistance of counsel as guaranteed by the Sixth Amendment; (2) that the military judge abused his discretion when he admitted the appellant's Facebook message into evidence; and (3) the military judge abused his discretion in denying the defense's motion under MILITARY RULE OF EVIDENCE 412, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2008 ed.).  We find merit in the appellant's initial assignment of error and will take corrective action in our decretal paragraph.[1]

## I. Background of Case

On Saturday, 30 October 2010, both the appellant and XM were Midshipmen at the United States Naval Academy and billeted at the Bancroft Hall dormitory.  The appellant and XM were classmates and had previously been involved in a romantic relationship.  On this day, the appellant came to XM's dormitory room where she was working on a school project.  Sometime after the appellant arrived at her dormitory room, XM alleges that the appellant digitally penetrated and then raped her.  Later that day, XM reported to a friend[2] that she had been sexually assaulted and eventually went to a civilian hospital for a sexual assault examination.  As part of the ensuing investigation conducted by the Naval Criminal Investigative Service (NCIS), the appellant was interviewed on 3 November 2010 and initially indicated that while he did go to XM's room on 30 October, the only physical contact he had with her was a mutual kiss.  Later that same night, when again interviewed by NCIS, the appellant admitted that he lied in his earlier statement.  In his second statement the appellant contended that in addition to mutual kissing, there was mutual, over the clothing caressing during which XM was saying the appellant's name in a pleasurable way.  The appellant also indicated that he attempted to put his hands down XM's pants, at which time she stopped kissing him and backed up.  The appellant denied inserting his fingers into XM's vagina and having sex with her.

---

[1] Having found that the appellant was denied effective assistance of counsel, his remaining assignments of error are moot.

[2] The friend, MIDN B, was also a Sexual Assault Victim's Intervention Guide at the Naval Academy.

2

Additional facts pertinent to the resolution of this assignment of error are provided below.

## II. Procedural History of Case

The appellant's trial, including a post-trial Article 39a, UCMJ, session, was completed on 27 January 2012. After receiving the staff judge advocate's recommendation and the appellant's three separate requests for clemency,[3] on 3 April 2012 the CA approved the sentence as adjudged.

The appellant's record of trial was originally docketed on 20 April 2012 and his initial appellate defense counsel submitted the case on its merits, i.e., without assignment of error, on 7 August 2012. While reviewing the record and allied documents, we discovered that the clemency matters submitted by the appellant's trial defense counsel averred that the appellant did not receive effective assistance of counsel at trial. Moreover, the trial defense counsel against whom this claim was levied was the same counsel who forwarded the appellant's concerns to the CA and represented the appellant in his post-trial matters.

On 26 September 2012, we directed that the appellant file a brief asserting a position on trial defense counsel's apparent conflict of interest during the post-trial processing of his case. After receiving and considering the appellant's brief, we ordered production of affidavits from the appellant's trial defense counsel responding to the appellant's allegation of ineffective assistance of counsel during the post-trial processing of his case. After considering the affidavits of the trial defense counsel, the pleadings of the parties, and the record of trial, on 7 January 2013, we set aside the original CA's action and returned the record of trial to the Judge Advocate General for remand to an appropriate CA for proper post-trial processing with a conflict-free counsel. This time, during the post-trial process, the appellant was afforded

---

[3] On 22 March 2012, the appellant submitted a request for clemency directly to the convening authority which included a letter from Ms. Mary C. Wilson dated 11 November 2011. On 25 March 2012, the appellant's trial defense submitted a clemency package which included the same letter appellant sent to the convening authority on his own behalf, and letters from two members who sat as part of the court-martial panel who decided appellant's case. Finally, the appellant requested that the CA consider a letter dated 25 March 2012 sent to the staff judge advocate on his behalf by Ms. Mary C. Wilson.

conflict-free counsel who provided clemency matters[4] on behalf of the appellant to the CA on 25 March 2013. On 4 April 2013, the CA again approved the sentence and except for the dismissal ordered it executed.

The appellant's case was redocketed with this court on 9 April 2013, and forwarded to the appellate defense division for the opportunity to file supplemental pleadings or to again submit the case on its merits. The appellant's new appellate defense counsel filed a brief asserting the aforementioned three supplemental assignments of error on 12 June 2013. After the Government filed its answer, the record was sent to panel on 11 September 2013

After considering the pleadings of the parties and the record of trial, and based in large part upon the detailed trial defense counsel's contention that he was ineffective in his representation of the appellant during the trial, on 8 October 2013, we ordered a hearing in accordance with *United States v. DuBay,* 37 C.M.R. 411 (C.M.A. 1968), to provide findings of fact and conclusions of law as to whether the appellant received effective assistance of counsel. The *DuBay* hearing was conducted from 17–19 December 2013, and the *DuBay* judge provided detailed findings of fact and conclusions of law.[5] The appellant's case was re-docketed on 19 June 2014 and forwarded to appellate counsel for supplemental briefing in light of the *DuBay* hearing. The last brief in this case, the appellant's reply brief to the Government's supplemental answer, was filed on 29 December 2014, with the appellant again arguing that he did not receive effective assistance of counsel at trial.

### III. Ineffective Assistance of Counsel

The appellant alleges that the trial defense team was ineffective in its representation at court-martial by:

(1) failing to use information readily available at

---

[4] The detailed post-trial defense counsel's 25 March 2013 clemency petition also raised issues of ineffective assistance of counsel and contained an affidavit provided by trial defense counsel detailing the errors he believed he committed in the representation of appellant during the court-martial process.

[5] We have independently reviewed the military judge's finding of fact and all, with the exception of finding of fact 42, are supported by the record. With the exception of finding of fact 42, we adopt them as our own.

4

its disposal to challenge XM's credibility and
testimony;

(2) presenting evidence that affirmatively assisted
the Government's case;

(3) failing to challenge a Government witness's
credibility;

(4) advising the appellant to testify on his own
behalf without adequate preparation by his counsel;

(5) performing poorly in front of the members, to
include delivering a sentencing argument contrary to
his client's wishes; and,

(6) failing to provide adequate pretrial
representation in that the defense team neglected to
make a motion to suppress the appellant's Facebook
page offered by the Government and waiving the issue
of multiplicity.

The appellant also contends that the combination of these
errors had the cumulative effect of depriving him effective
assistance of counsel as guaranteed by the Sixth Amendment. We
agree.

To effectively evaluate these claims, we must carefully
review every aspect of the appellant's case and balance these
claims against the total record. In this review, we not only
consider the experience, training, and abilities of the trial
defense team, but also their preparation and presentation
starting with the investigative and pretrial proceedings and
culminating in their representation of the appellant during
post-trial matters.[6]

## IV. The Law

The Sixth Amendment entitles criminal defendants to
representation that does not fall "below an objective standard
of reasonableness" in light of "prevailing professional norms."

---

[6] As stated above, the appellant alleged that his counsel were ineffective in
their representation of him at trial, thereby creating a conflict of interest
in the representation of him during post-trial matters. We set aside the
original CA's action and the appellant was given new, conflict-free counsel,
to assist him in the new post-trial processing of his case.

*Strickland v. Washington*, 466 U.S. 668, 688 (1984). The Court of Appeals for the Armed Forces (CAAF) has applied this standard to military courts-martial, noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J 360, 361 (C.A.A.F. 2010) (citations omitted). In order to show prejudice under *Strickland*, "[t]the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Counsel are presumed to be competent[7] and therefore our inquiry into an attorney's representation must be "highly deferential" to the attorney's performance and employ "a strong presumption that counsel's conduct falls within the wide range of professionally competent assistance." *Id.* at 689. The appellant has the heavy burden of establishing a factual foundation for a claim of ineffective representation. *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000). Strategic or tactical decisions made by a trial defense counsel will not be second-guessed on appeal unless the appellant shows specific defects in counsel's performance that were unreasonable under prevailing professional norms. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). The appellant's burden of proof requires that he provide a specific, particularized statement of the errors or deficient performance alleged and that he support his claim by evidence and facts. Bare allegations based on speculation, conjecture, and conclusory comments will not suffice. *United States v. Jones*, 39 M.J. 815, 818 (A.C.M.R. 1994).

The CAAF has applied a three-prong test to determine if the presumption of competence has been overcome:

(1) Are the allegations true; if so, "is there a reasonable explanation for counsel's actions?"

(2) If the allegations are true, did defense counsel's level of advocacy fall "measurably below the performance ordinarily expected of fallible lawyers?";

---

[7] *United States v. Cronic*, 466 U.S. 648, 658 (1984).

> (3) If defense counsel was ineffective, is there a
> "reasonable probability that, absent the errors,"
> there would have been a different result?

*United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations and internal punctuation omitted).  When more than one counsel is involved, we evaluate the combined efforts of the defense as a team rather than evaluating the individual shortcomings of any single counsel.  *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001).  The court "looks at the questions of deficient performance and prejudice de novo."  *United States v. Gutierrez*, 66 M.J. 329, 330-31 (C.A.A.F. 2008) (citations omitted).

## V. Analysis

The appellant provides multiple examples of conduct or omissions that he claims prejudiced his case, ultimately denying him effective assistance of counsel.  We limit our analysis and discussion to three basic aspects: (1) the defense team's qualifications and capabilities; (2) the defense team's conduct in challenging the Government's case, to include the cross-examination of key witnesses; and, (3) the presentation of the defense.

A. The Defense Team's Experience

The appellant was represented at court-martial by two junior defense counsel, Lieutenant (LT) S, as lead counsel, and LT T as the assistant defense counsel.  For LT S, this was his first contested trial.  His only other "litigation" experience was handling three judge-alone guilty plea cases and negotiating a nonjudicial punishment in lieu of court-martial in another case which, in all likelihood, involved no time in court.[8]  *DuBay* Record at 36.  LT T's only litigation experience involved handling, as lead counsel, a guilty plea case involving a Sailor charged with possession of child pornography.  While LT T had significant experience in the Navy as a former surface warfare officer, she, like LT S, had no real litigation experience.

---

[8] LT S indicated that he was also assigned as the assistant defense counsel on a case concerning a gang-rape sexual assault involving many Sailors.  LT S and the lead counsel worked out an agreement with the CA where their client would testify against the others for a favorable pretrial agreement.  LT S indicated that his participation in the case was limited to sentencing and that he did not examine any witnesses during direct or cross, and got very little out of the experience.  *DuBay* Record at 37.

7

Recognizing their lack of experience and need for assistance on appellant's case, LT S submitted a request for the assignment of an individual military counsel (IMC) to the case. LT S was insistent upon the IMC having Naval Academy experience and requested the assignment of LCDR R, a Navy judge advocate who was a graduate of the Naval Academy and an instructor at the Naval Justice School. When LCDR R's commanding officer determined that he was unavailable and could not serve as an IMC in this case, the defense team filed and then withdrew a motion for review of the denial and did not pursue the issue any further. Additionally, the trial defense team did not make the military judge aware of their concerns that they lacked the litigation experience to effectively represent the appellant and were in over their heads. *DuBay* Record at 47.

In sum, the appellant was represented by two defense counsel who between them had litigated no contested courts-martial, let alone a forcible rape case involving expert testimony and forensic evidence. While the defense team's command leadership told LT S that if he needed help he would receive it, the trial defense team never took advantage of the offer of assistance. *DuBay* Record at 280; *DuBay* Finding of Fact (FOF) 88. While the *DuBay* record makes it clear that the defense team was dedicated to providing the appellant with competent representation, they could not overcome their lack of experience and inadequate preparation.

The trial defense team's lack of experience and LT S's affidavits, as well as his admissions during the *DuBay* hearing that he did not provide the appellant with effective counsel at trial, certainly assists the appellant in meeting the heavy burden of rebutting the presumption of competence, at least as it pertains to the first prong of *Strickland*. LT S's belief that he was ineffective, while significant, is but one factor this court considers in its *Strickland* analysis. We must look to the "adequacy of counsels' performance, rather than viewing the limited experience of counsel as an inherent deficiency." *United States v. Murphy*, 50 M.J. 4, 9 (C.A.A.F. 1998) (citing *Lockhart v. Fretwell*, 506 U.S. 364 (1993)) (additional citations omitted). However ". . . inexperience -- even if not a flaw *per se* -- might well lead to inadequate representation". *Id.* In the final analysis, we must consider whether the defense team's errors were so serious that the appellant was deprived "of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

8

B. The Government's Case in Chief

     Prior to trial commencing, the trial counsel moved the
court to allow NCIS Special Agent (SA) B, the investigating
agent in this case, to remain at counsel table during the trial.
The trial defense team initially opposed this move, but later
acquiesced when the trial counsel stated that the agent would be
called as a witness first, making concerns that SA B could hear
other testimony prior to taking the stand moot.  Based upon
trial counsel's representation, LT S indicated that he planned
his trial strategy around SA B being called first and had
scripted some leading questions designed at pointing out
inconsistencies in statements the victim had made to her.  The
Government, however, decided not to call SA B at all during the
trial, which made LT S feel as if his "preparations just [went]
up in the air, and [he] had to readjust."  *DuBay* Record at 71.
When asked if he was prepared in the event that the Government
did not call SA B as a witness, LT S's answer was, "No.  I
expected she was going to be called first."  *Id.; DuBay* FOF 28.
LT S indicated that he had difficulty adjusting to this new
development.

     During the presentation of the Government's case, the
appellant contends that the trial defense team possessed
impeachment information, yet neglected to use it, and therefore
failed to effectively cross-examine the chief prosecution
witnesses, including XM, the alleged victim.  The testing of the
Government's proof by counsel "in the form of a thorough,
focused cross-examination of [witnesses], [is] pivotal to the
effective defense of [appellant]."  *United States v. Gibson*, 51
M.J. 198, 201 (C.A.A.F. 1999).  We are mindful however, that
strategic or tactical decisions, which include decisions as to
whether and to what extent to cross-examine the Government
witnesses, made by a trial defense counsel, are not normally
second-guessed.  Instead, we look to see if defense counsel's
actions were unreasonable under prevailing professional norms.
*Mazza*, 67 M.J. at 475.

     The alleged sexual assault occurred in a dormitory room of
Bancroft Hall aboard the United States Naval Academy during a
time when the building was, for the most part, devoid of other
Midshipmen, who were on a field trip.  Other than the testimony
of the appellant and XM, there was no evidence that anyone else
heard or saw anything out of the ordinary that day.

     XM testified at both the Article 32 Investigation and at
trial.  The appellant argues that she gave inconsistent

9

testimony which should have been further developed on cross-examination to challenge her credibility before the members. For example, the appellant contends that at trial XM indicated the appellant was standing and grabbed her arm, told her to "Get up," which she did, then sexually assaulted her from behind while both were standing. She went on to say during her trial testimony that she tried to remove the appellant's hands from her body during the sexual assault, to no avail, and when she was able to separate from him saw ejaculate on his pants. Record at 528-36. At the Article 32, XM stated that she complied with the appellant's whispered order to get up without being grabbed; that she froze and did nothing to prevent the attack; and that the appellant ejaculated on her upon completion of intercourse. When asked why he didn't use these inconsistent statements to challenge the alleged victim's testimony, LT S stated that he forgot to do so.

We note that while LT S contends that he simply forgot to ask XM about the discrepancies in her testimony at trial and her testimony at the Article 32 Investigation, the trial defense team had neither a transcript of her testimony from the Article 32 Investigation, nor a way to play the pertinent sections of the recording for the members. In other words, while LT S maintains that he had planned to use this information to impeach and thereby challenge the credibility of XM, he had no mechanism in place to do so if XM denied making statements inconsistent with her Article 32 testimony.

Perhaps more disturbingly, LT S indicated he had information that XM confided in Midshipman (MIDN) B and told her that the appellant sexually assaulted her while she was lying on the floor – a significant deviation from both her Article 32 and in-court testimony. This information was never presented to the members.

In an attempt to get this inconsistent statement before the members, the following colloquy occurred during LT S's cross examination of XM:

Q: And then you coordinated with [MIDN B] and you met [MIDN B] at the game:
A: Yes, sir.

Q: Okay. And did you tell her at the game what happened?
A: I told [MIDN B] what happened.

Q: And did you tell her about the assault?

10

A:  I told her I was raped.

Q:  Did you describe how it happened?
A:  I just said "I was raped in my room," not how it – like the details of what happened.

Q:  You didn't give her any of the details about where you were standing or he was standing?
A:  No, sir.

Q:  So, you didn't tell her that you were on the floor and that he was on top of you?
TC:  Objection, hearsay.

MJ:  What are you offering it for, counsel?
DC:  I'm offering it to impeach the credibility of the witness, sir.

Record at 561-62.

After the military judge called for an Article 39a session and the members were excused, the following exchange occurred:

MJ:  Where are we going?

DC:  Sir, it's my belief I –that [MIDN B] if called to testify will testify that [XM] did, in fact, describe the assault and the events of the assault, and the incident that she reports would be inconsistent with the testimony that she gives today.

MJ:  Well, you've already asked her: Did you tell [MIDN B] the details?" and she said, "No, texted something bad happened…Coordinated with Lieutenant – with [MIDN B] to meet at the football game.  I told the [MIDN B] I was raped in my room."  So, have you not answered –the witness has not already answered your questions?
DC:  Understood, sir, thank you.

MJ:  You want to ask her one more time, "Did you give the details to [MIDN B] on the 30th of October …
DC: That would be a fair question, sir.

MJ:  ...while at the football game?"
DC:  Yes, sir, that would get to my point.

MJ:  You are more than welcome to go down that road.

11

DC:  Yes, sir

MJ:  And then your case or, you know, if [MIDN B] testifies in the government's case, you can cross-examine her with a prior inconsistent statement at that point.

*Id.* at 563-64.

When the members reassembled and the cross-examination of XM continued, she was asked if she remembered telling MIDN B about the details of what happened that day, to which XM answered: "Not really details, no, sir."  *Id.* at 566.

Unable to get this information before the members via the cross-examination of XM, later in the trial, as part of their case in chief, the defense team called MIDN B.  The only questions of any substance MIDN B was asked by LT S was if she thought XM was truthful to which she replied: "My opinion is that she'll be fully truthful in some situations, but not fully truthful in other situations."  *Id.* at 812.

At the Article 39(a) session called by the military judge during the cross-examination of XM, the defense team intimated that their strategy was to challenge the credibility of the alleged victim by demonstrating that she gave varying accounts of the alleged sexual assault.  They even gave an offer of proof as to what MIDN B would say if called to testify.  The only way to get this information before the members was either through the cross-examination of XM, which failed, or the direct examination of MIDN B.  The trial defense team failed to fully develop this inconsistent statement theory that they had cultivated by the cross-examination of XM and instead myopically focused on XM's truthfulness.  At the *DuBay* hearing, the trial defense counsel indicated that his failure to inquire about the prior inconsistent statement was not a strategic decision. *DuBay* Record at 742-43.  As a consequence, this information never made it to the members.

Similarly, the appellant argues that the trial defense team had impeachment information and failed to use it in the cross-examination of Nurse B, the nurse who examined XM after the alleged sexual assault.  Trial defense counsel had knowledge that Nurse B had a federal conviction for conspiracy to pass counterfeit United States currency, and knew that conviction was admissible for impeachment. *DuBay* FOF 35, 98; *DuBay* Record at 101-02.  The trial defense team not only failed to obtain a certified copy of the conviction to use at trial, they also

12

failed to confront Nurse B about its existence during cross-examination. *DuBay* FOF 35; *DuBay* Record at 101-02, 449.

During the *DuBay,* LT S admitted that he had informed the appellant of the importance of said conviction pretrial and intended to employ it as impeachment evidence. When questioned by the appellant as to why he did not confront Nurse B with this impeaching information, he stated he had simply forgotten about it. *DuBay* FOF 35. While learned jurists might debate the point as to what, if any, effect this evidence would have had on the members, as well as the admissibility of such evidence,[9] we decline to engage in such speculation. The fact remains that this was part of the defense team's strategy that they failed to utilize due to oversight, thus highlighting their lack of experience and/or preparation. In other words, the failure to utilize a *crimen falsi* conviction for a federal offense involving dishonesty to attack the witness's credibility was clearly not a strategic choice but a glaring omission.

The appellant additionally contends that the trial defense team had information at their disposal which suggested that Nurse B had a tendency to "chart[] a little too much" and wanted to use this to challenge XM's sexual assault examination findings. Record at 127. The trial defense team again failed to explore or develop this information on cross-examination. The trial defense team additionally neglected to review XM's medical record to see whether any of the bruises or abrasions were documented prior to the alleged assault, as XM was a member of one of the Naval Academy's sports teams. The trial defense team, while acknowledging that this information could have been important and useful, indicated that they simply neglected to review XM's medical record prior to trial. Thus, the members were left with uncontroverted evidence that her bruises and abrasions were caused by the alleged sexual assault.[10]

In the appellant's case, the fact that sexual intercourse

---

[9] Nurse B was convicted in 1991 and sentence to three years' probation in 1993. MILITARY RULE OF EVIDENCE 609(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2008 ed.), generally restricts admissibility of criminal convictions if more than ten years old. Evidence of a conviction more than ten years old is not admissible unless the court determines, in the interest of justice, that the probative value outweighs its prejudicial effect.

[10] At trial, XM indicated that although she played a sport at the Naval Academy, most injuries from her position are located on the legs and below the knees, not above the waist. Record at 587. However, the record suggests that she had documentation in her medical record of a concussion from playing this sport.

13

occurred was not in dispute by either side and thus the only issue was one of consent.  That fact is critical to the analysis of the defense team's performance.  The Government's proof of sexual assault, arguably, rested on the testimony and the credibility of XM, the alleged victim, and the medical findings recorded by the sexual assault nurse examiner.  The trial defense team's failure to bring out the aforementioned salient points during cross-examination had the practical effect of allowing the testimony of the alleged victim and the nurse examiner to go, for all intents and purposes, unchallenged.  When asked why he failed to challenge their testimony on cross-examination with the impeachment evidence he had at his disposal, LT S again stated that he forgot and that they were not strategic or tactical decisions by the defense team.

C.    Presentation of the Defense

Lastly, we look at the case the defense put before the members in the representation of their client.  As noted above, the fact that sexual intercourse occurred was not in dispute, with the defense contending that it was consensual.  Throughout his opening statement, however, LT S consistently referred to the sex act as a "sexual assault" and concluded his opening statement by telling the members: "[T]here is only one witness to the sexual assault, [XM]."  Record at 441.  Throughout the court-martial, LT S continued to refer to the event in question as an "assault."  Record at 561, 568, 582.  Defense counsel's reinforcing to the members that the sexual encounter was an assault had the effect of assisting the Government and bolstering the case against the appellant.  *See United States v. Garcia*, 59 M.J. 447, 452 (C.A.A.F. 2004).

After LT S completed the defense's opening statement, the assistant trial defense counsel pulled him aside and told him that he needed to get past the issues he had in his opening and "focus on what's coming up next" and asked their command's senior defense counsel if she needed to "do anything right now, to step in, or alert the judge, or alert [her] client?"  *DuBay* Record at 600-01; *DuBay* FOF 254.

The day the court-martial commenced was the day after the new commanding officer of Defense Service Office North took command.  After witnessing the opening statement delivered by LT S, she became immediately concerned that LT S "was either unprepared, or too nervous to be able to conduct himself appropriately in the trial."  *DuBay* Record at 512; *DuBay* FOF 215.  As a result of this observation she immediately directed

14

that the trial defense team receive assistance and that LT S receive remedial training before trying another case. *DuBay Record* at 513; *DuBay* FOF 217.

The trial defense team continued to struggle throughout the remainder of the trial. The record reflects that LT S labored to think on his feet and did not show a command of the basic rules of evidence. The record is replete with many instances where LT S attempted to enter matters into evidence – either documentary or testimonial – and the military judge would recess the hearing and direct him to consult with his senior defense counsel so that he could receive instruction as to how to complete his objective within the rules of evidence.

With the defense's theory that this was a case of consensual sex, credibility was the critical issue for both sides. In an attempt to bolster his client's credibility, the trial defense counsel called MIDN D, the appellant's ex-girlfriend, to the stand and asked her if she trusted the appellant; she answered that she did not. Record at 735. The impact of this testimony was so damaging that the military judge halted the examination *sua sponte*, calling an Article 39a session in which he told LT S, "I just watched you take a broadside hit," directed that he speak to his supervisory counsel and offered to recess the court for the day in order for counsel to take time to prepare. *Id.* at 736. This damaging testimony is directly attributable to LT S's failure to properly prepare this witness prior to her taking the stand. LT S admitted that even though he spoke with MIDN D prior to calling her as a witness, he never asked her the question as to the appellant's trustworthiness prior to her taking the stand, and did not know what her response would be.

Next the appellant alleges that trial defense counsel put him on the stand and did so "without advice or proper preparation." Appellant's Brief of 17 Jul 2014 at 23. It is not in dispute that trial defense counsel advised and ultimately persuaded the appellant to take the stand despite the appellant's original desire not to testify. *DuBay* FOF 281, 282; *DuBay Record* at 712-13. We recognize that the accused has the ultimate authority to make certain fundamental decisions regarding the case, including whether or not to testify in his own defense. *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (citing *Wainwright* v. *Sykes*, 433 U.S. 72, 93, n. 1 (1977) (Burger, C.J., concurring)) (additional citation omitted). However, equally as notable are counsel's duties which "include consulting with the defendant on important decisions, keeping the defendant informed

15

of important developments, and bringing to bear 'such skill and knowledge as will render the trial a reliable adversarial testing process.'" *Garcia*, 59 M.J. at 452 (quoting *Strickland*, 466 U.S. at 688). Additionally, Judge Advocate General Instruction 5803.1C, Rule 1.4(b) (Ch-1, 10 May 2010) states an attorney must explain matters to their client to the extent that allows them to make "informed decision[s] regarding the[ir] representation."

There is evidence that the trial defense team advised and convinced the appellant to testify without informing him of the consequences. For example, the appellant was not informed that his previously suppressed statement to NCIS would come into evidence to impeach his testimony. *DuBay* FOF 64, 66, 269; *DuBay* Record at 187. Secondly, trial defense counsel failed to account for the fact that the appellant's testimony would contradict the forensic evidence presented by the Government.[11] The trial defense team also failed to recognize a number of inconsistencies in the appellant's own statements. *DuBay* FOF 108; *DuBay* Record at 486, 686-87, 745; Record at 1016-20.

Trial defense counsel's advice to the appellant to take the stand in spite of his reluctance to do so directly resulted in:

(1) a previously suppressed statement in which he lied to NCIS being placed into evidence;

(2) a number of inconsistencies in the appellant's own account of the matter being highlighted to the members; and,

(3) the appellant directly contradicting forensic evidence in a trial that largely hinged on credibility.

Finally, the appellant points out that he testified during sentencing and indicated that he wanted to remain in the Naval service, namely at the Naval Academy, and yet LT S argued for a

---

[11] At trial, the appellant contended that while he engaged in consensual sex with XM, he did not ejaculate on her or in her but rather returned to his room where he masturbated and then ejaculated, outside the presence and proximity of XM. The forensic evidence presented at trial by the Government found semen on XM and her clothing, confirming that he did ejaculate on her and in her presence. The glaring inconsistencies in the appellant's testimony and the forensic evidence had the practical effect of making the appellant's account of the sexual encounter less credible to the members.

16

dismissal, in direct contravention of his wishes.  The appellant testified:

> Q: Would you – if you could, would you still want to be in the Marine Corps?
> A: Yes, sir.
>
> Q: Is there anything else you want to tell the court-martial here today?
> A: . . . at this point, when I say the Naval Academy is all I have, it really is all I have (Crying).

Record at 1293.

In arguing for an appropriate sentence, LT S stated, "Certainly, dismissal from the Naval Academy, I mean your judgment wouldn't be complete without it." *Id.* at 1314.  The military judge *sua sponte* asked for clarification of defense's argument.  LT S stated, "I am asking for a dismissal and . . . zero punishment besides a dismissal." *Id.* at 1315.  The military judge then called an Article 39a session in which he addressed LT S, saying "[Y]our client testified that he wanted to stay in the Navy and even wanted to even become a Marine Corps Officer, and that's the sworn testimony of your client on the stand, and yet you're standing in front of the members saying give him a dismissal." *Id.* at 1316.  "Counsel may not [] ask a court-martial to impose a punitive discharge when the accused's wishes are to the contrary." *United States v. Dresen*, 40 M.J. 462, 465 (C.M.A. 1994) (citing *United States v. Robinson*, 25 M.J. 43, (C.M.A. 1987)) (additional citations omitted).  The military judge then gave the members a curative instruction on the record and allowed LT S to reargue sentencing in which he again referenced the option of a discharge.  Record at 1316, 1318-20.

D. Cumulative Effect of Errors.

In the appellant's case, the evidence was not overwhelming.  While there was some medical evidence of bruising supporting the alleged victim's account of the sexual contact, this case ultimately boiled down to the issue of credibility.  It was on this point that the trial defense team failed in several significant ways summarized as follows:

> (1) The defense team failed to effectively cross-examine the alleged victim in that it had evidence of inconsistent statements made by XM during the Article

17

Investigation that differed significantly from her testimony at trial but had no mechanism in place to challenge her on cross-examination;

(2) While the trial defense team planted the seed in the minds of the members that the alleged victim told MIDN B yet another account of the sexual assault, they forgot to follow up with this line of questioning after calling her as a witness;

(3) The trial defense team's attempt to bolster their client's credibility had the opposite effect when they asked MIDN B if she thought the appellant was trustworthy and she responded in the negative; and

(4) Finally, while we do not second-guess the defense's tactical decision to put the appellant on the stand, the record strongly suggests that they did so without fully considering or advising him of the ramifications of doing so, including opening the door to the use of his previously suppressed statement, which was replete with inconsistencies, as impeachment evidence.

Based on the foregoing, we have little difficulty concluding that the trial defense team's level of advocacy fell "measurably below the performance [] (ordinarily expected) of fallible lawyers." *Polk* 32 M.J. at 153 (citation omitted).

E. Prejudice

Having found the trial defense team deficient in their representation of the appellant, we next test for prejudice. That is, is there a "reasonable probability that, absent the errors," there would have been a different result. *Id*. (citations omitted)

In *United States v. Dollente*, 45 M.J. 234 (C.A.A.F. 1996) the CAAF found that a combination of three evidentiary errors cumulatively affected the case and prejudiced the appellant. The CAAF wrote: "although individually each error in this case does not warrant reversal, the 'combined effect of these . . . errors was so prejudicial so as to strike at the fundamental fairness of the trial.'" *Id*. at 236 (quoting *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993)). "In sum, the 'cumulative effect of these errors denied appellant a fair trial.'" *Id.* (quoting *United States v. Banks*, 36 M.J. 150, 152

18

(C.M.A. 1992)). The Ninth Circuit in *Harris v. Wood,* 64 F.3d 1432, 1438 (9th Cir. 1995) stated, "Prejudice may result from the cumulative impact of multiple deficiencies." (Citation and internal quotation marks omitted). Similarly, the CAAF has found that it is appropriate "to consider whether defense counsel's conduct of the trial as a whole might have been defective within the meaning of *Strickland*, even though individual oversights or mistakes standing alone might not satisfy *Strickland*." *United States v. Loving*, 41 M.J. 213, 252 (C.A.A.F. 1994) (citing *Frey v. Fulcomer,* 974 F.2d 348, 361 n.12 (3d Cir. 1992) (prejudice determined by review of all of counsel's errors combined).

While the aforementioned errors standing alone may not get over the "high hurdle" established in *Strickland*, "[w]e cannot say with any certainty that the cumulative effect of these errors did not affect the outcome of this case." *See Dollente*, 45 M.J. at 243 (citations omitted). Accordingly, we concur with the *DuBay* judge's conclusion of law that the appellant was not afforded effective assistance of counsel as guaranteed by the Sixth Amendment.

## Conclusion

The findings and the sentence are set aside. The record is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Senior Judge BRUBAKER and Judge HOLIFIELD concur.

For the Court

R.H. TROIDL
Clerk of Court

19